```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA


WADLEIGH ENERGY GROUP, INC.                         CIVIL ACTION

VERSUS                                              NO. 05-1936

FOREST OIL CORPORATION                              SECTION
                              "A"(1)
```

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter came on for trial before the Court, sitting without a jury, on January 9, 2007. Following the close of all evidence, the Court took the matter under advisement and instructed counsel to submit their post-trial memoranda no later than January 31, 2007.

Having now considered the pleadings, evidence offered at trial, arguments of counsel, and applicable law, the Court renders its Finding of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a). To the extent certain findings of fact are more appropriately classified as conclusions of law, they should be so construed. To the extent certain conclusions of law are more appropriately classified as findings of fact, they should be so construed.

## FINDINGS OF FACT

Wadleigh Energy Group, Inc., plaintiff herein, is an oilfield offshore service company which offers *inter alia* crane repair, maintenance, and equipment rental services to its customers. Forest Oil Corporation, defendant and counter-claimant herein, has been a customer of Wadleigh's since the early 1990s. Wadleigh performed services for Forest Oil under contract but historically the parties' contracts had not been reduced to writing.

In December 2001, Wadleigh and Forest Oil entered into two written contracts. The first was a crane maintenance contract pursuant to which Wadleigh would service and maintain Forest Oil's cranes located on its platforms in the Gulf of Mexico. (Exh. 24) The second was an electricians contract pursuant to which Wadleigh would provide electricians to service and maintain Forest Oil's platforms in the Gulf. (Exh. 25). These contracts were reduced to writing at the behest of and for the benefit of Wadleigh whose creditors viewed the written contracts more favorably.

Both contracts were two-year contracts covering the period beginning January 1, 2002, and ending December 31, 2003. Forest Oil's annual cost per crane under the crane contract for this two year period was approximately $43,727.71. Wadleigh relied upon past experience with crane maintenance costs when deriving this dollar figure but the price was negotiated based on what Wadleigh believed the maintenance costs would be--the

2

risk being the large expense for certain crane parts.

The contracts are best characterized as "turnkey" or "availability" contracts. Forest Oil was invoiced based on the number of cranes in the field at any given time and not by the actual number of hours actually worked or the number of parts actually replaced. A large part of the service that Forest Oil paid for was the availability of Wadleigh personnel for call-out to the field should the need arise beyond the normal scheduled maintenance and record keeping that Wadleigh performed for Forest Oil, such as for equipment failures. Under such a contractual arrangement, the customer pays for the "availability" of the services when needed without regard to whether the customer actually availed itself of those services. Forest Oil was responsible for arranging transportation to ensure that Wadleigh's personnel made it out to the platforms where the services were to be rendered.

The crane contract, although basically a flat-rate agreement, did exclude certain items such that Wadleigh would be allowed to invoice Forest Oil for those items in addition to the monthly contract rate. For instance, crane parts and rental equipment that were outside the realm of "routine maintenance" as well as certain specifically enumerated items were billed to Forest Oil as "overage." (Exh. 24).

Both contracts contained the following provision: "In the event of Wadleigh's default, Forest has the right to cancel [the] contract after thirty (30) days written notice. In the

3

event Forest cancels [the] contract [for reasons] other than Wadleigh's default, Wadleigh is entitled to the remaining amount which would be due for the term of the contract through the final day of December 31, 2003."  (Exhs. 24 & 25).

Both contracts were signed by Billy R. Meyers on behalf of Forest Oil.  Meyers began his career with Forest Oil as a roustabout and eventually worked his way up to the level of production foreman/supervisor.  Meyers always received stellar performance appraisals and bonuses during his employment with Forest Oil.  Bud Knell, Division Manager for Forest Oil, was Meyers' immediate supervisor and he believed Meyers to be a solid employee whom he had no reason to fire.  Meyers was Wadleigh's contact at Forest Oil until Meyers was relieved of the crane maintenance duties in late 2004.

Meyers believed that obtaining crane and electrician services pursuant to a fixed contract as opposed to a time and materials contract would allow Forest Oil to better control costs and to better predict its exposure on maintenance costs in the Gulf.  Meyers had no direct knowledge of how Wadleigh arrived at the appropriate amount to charge per crane for maintenance but the contracts had been awarded to Wadleigh following a formal bidding process in which other vendors' less competitive bids had been rejected.

Wadleigh also performed welding services for Forest Oil.  Those services were not performed pursuant to a written agreement and Forest Oil also relied upon other vendors for

4

welding services.

Forest Oil's performance in the Gulf was considered excellent during the years that Wadleigh performed services for Forest Oil.  Wadleigh was responsive to Forest Oil's needs and as of the time that Meyers left Forest Oil he had no complaints about the services rendered under the contracts.  During Wadleigh's tenure with Forest Oil no injuries or project shut-ins were ever caused by a lapse on the part of Wadleigh.  However, Forest Oil did occasionally have problems with Wadleigh's record keeping, reporting, and document maintenance services.

Until late 2004, Forest Oil had never contested Wadleigh's invoices or complained that the rates being charged were inconsistent with the terms of the parties' agreements.

Forest Oil did receive one Incident of Non-Compliance or "INC" from the Minerals Management Service ("MMS") during the many years that Wadleigh serviced its platforms.  Wadleigh worked with Forest Oil to remedy the problem and Forest Oil paid nothing out of pocket in the way of a fine although Forest Oil's employees spent many hours themselves trying to rectify the situation.  Meanwhile, other operators in the Gulf were reported to have in excess of 100 INCs associated with a lesser number of platforms.

In November 2003, as the two-year crane and electricians contracts were nearing termination, Forest Oil acquired 40 to 50 additional platforms, with at least that many cranes, from

Unocal. It was to be expected that Forest Oil's overall operational costs would rise with a significant increase in the number of platforms. Moreover, Wadleigh's costs to maintain the cranes would be expected to go up in proportion to the number of cranes in the field. This is true even if manpower is not increased because the significant expense associated with crane maintenance is the parts involved, not manpower.

The Unocal acquisition initially placed a significant strain on Forest Oil's resources, including Meyers' workload. Meyers approached his immediate supervisor, Bud Knell, about carrying over the existing vendor contracts for the Gulf region into 2004, if the vendors were willing to keep their rates the same. This was to be done in lieu of going through the formal bidding process and until such time as Forest Oil could "get its arms around" the increased workload associated with the Unocal acquisition. Knell approved Meyers' suggestion so long as the vendors were willing to keep their rates the same.

Meyers' intention was to extend the existing contracts for all of 2004 if necessary but believed that they could be terminated with notice. Meyers had no recollection of whether the 30 day notice provision present in the 2002-2003 written crane and electricians contracts had been discussed when he approached Wadleigh regarding the 2004 contract. The terms of the 2004 contract were not reduced to writing.

Meyers' discussions regarding the 2004 extension were with Mike Reine, not with Ralph Wadleigh. Reine did not testify at

trial and his testimony was not offered via deposition.

The rates that Wadleigh charged Forest Oil did not remain the same under the 2004 agreement.  Wadleigh's billings under the crane maintenance contract increased to as much as $11,772.85 annually per crane.  Meyers approved the invoices and Forest Oil paid the higher rate.

In the spring of 2004, Bud Knell left his position with Forest Oil and J.C. Ridens replaced him.  Ridens determined that operational costs were significantly over budget due mostly to contractual services and crane repair/maintenance costs.  Ridens discussed the problem with Meyers but Meyers could not justify the costs to Ridens' satisfaction.  Ridens felt that Meyers did not follow-up on certain billing problems with Wadleigh as he had been instructed to do.

Ridens wanted all of the existing 2004 vendor contracts rebid in order to get control of costs.  Ridens wanted to move over to the new vendors as soon as possible.  In June 2004 Meyers instructed Wadleigh to remove all of its electricians from the Forest Oil platforms.  In August 2004, Ridens sent a letter to Mike Reine in which he complained about the level of service that Wadleigh was providing under the crane maintenance contract.  (Exh. 47).  Ridens threatened to terminate the crane contract if future audits revealed that Wadleigh was not providing all of the services required by the contract. Wadleigh did not respond to the letter.

In October 2004 Ridens stripped Meyers of all responsibility for the crane maintenance program. That same month Ridens fired Meyers because it was clear to him that "Meyers was in over his head."

Kim Fawvor assumed Meyers' duties under the crane maintenance program. Fawvor approached Luke Band, an officer and part-owner of Harley Crane, Wadleigh's crane division, about converting the crane contract from a monthly flat fee arrangement to an hourly arrangement. Fawvor received correspondence under Band's signature dated September 29, 2004, confirming a conversation between Band and Fawvor regarding an hourly pricing structure for crane maintenance. In October 2004, Wadleigh field tickets began for the first time to reflect hourly billing for crane maintenance services.

From July 2004 through December 2004 Wadleigh provided no electricians for Forest Oil platforms and in July 2004 Wadleigh stopped billing Forest Oil for the electricians contract.

In December 2004 Wadleigh invoiced Forest Oil for the electricians contract for the July 2004 through December 2004 time period.

**CONCLUSIONS OF LAW**

The Court has subject-matter jurisdiction of this action pursuant to 28 U.S.C. § 1332, diversity jurisdiction.

**A.   Wadleigh's Main Demand Against Forest Oil**

Wadleigh's claims against Forest Oil are dismissed with prejudice.

### 1.   *Breach of Contract--Crane Contract (10/01/04-12/31/04)*

Wadleigh is not entitled to payments under the crane contract for the October to December 2004 time period. A party claiming the existence of a contract has the burden of proving that the contract existed. Godfrey v. AAB Amusement Co., No. 04-2052, 2005 WL 2467773, at *4 (W.D. La. Oct. 6, 2005) (citing Hunter Co. v. Comm'rs of Bossier Levee Dist., 115 So. 2d 226 (La. App. 2d Cir. 1959)). Mutual consent, also known as a meeting of the minds, is an essential element to the formation of a contract. Id. (citing La. Civ. Code art. 1927).

In order to recover crane contract payments for the October to December 2004 time frame, Wadleigh must establish that the parties intended to renew the existing contract for the entire 2004 year such that Forest Oil would be penalized for cancelling the agreement without cause. The evidence offered at trial does not establish that the parties had a meeting of the minds as to this issue.

Ralph Wadleigh could offer no first hand evidence regarding the terms of the 2004 agreement, which is not

9

surprising given that all the discussions regarding the 2004 carryover were between Meyers and Mike Reine, who did not testify at trial. Meyers candidly testified that he had very little recollection of the specifics that he and Reine had discussed. In particular Meyers had no recollection of whether he and Reine had even discussed the cancellation penalty. The Court found Meyers to be a credible witness and the Court credits his testimony.

The evidence does not establish that the agreement reached between Meyers and Reine was to simply treat the existing crane contract, which included a cancellation penalty, as if it now expired on December 31, 2004, instead of December 31, 2003. In other words, the Court is not persuaded that the parties had a meeting of the minds to commit Forest Oil to Wadleigh for an entire additional year. Not only is there a lack of evidence to support such a conclusion, but it is also implausible in light of the factual backdrop that led to the 2004 extension.

The 2004 extension grew out of the Unocal acquisition and the immediate strain it placed on Meyers' workload. But for the Unocal acquisition Forest Oil would have simply rebid the crane contract at the close of 2003. Given that Meyers' goal was to continue without interruption the crucial services that Wadleigh provided to Forest Oil, while at the same time avoiding the time consuming process of formally rebidding the contract, it is implausible that Meyers would have agreed to commit Forest Oil to the crane contract with Wadleigh for all

of 2004.  And given that Forest Oil wanted the rates to stay at the current level, it is likewise implausible that Wadleigh would have committed to keep charging the 2003 rates for the entirety of 2004.

A far more plausible explanation, and one consistent with Meyers' testimony, is that the contract was being carried over into 2004 subject to cancellation with notice when Forest Oil was able to get its arms around the Unocal acquisition and rebid the contract.  Forest Oil benefitted from the arrangement but so did Wadleigh because Wadleigh was able to continue into 2004 with this very lucrative contract at a time when it could have lost out altogether had it not been the successful bidder for the 2004 contract.  As it turns out, when the contract was formally rebid, Wadleigh was not awarded the contract after all.

Wadleigh received all of the notice that it was entitled to when Forest Oil terminated the contract.  Thus, Forest Oil did not breach the parties' agreement.

Even if Wadleigh had proved that the parties had initially agreed to commit for an entire additional year, the evidence establishes that Wadleigh had subsequently agreed to convert the contract to an hourly/time and materials agreement in September 2004.  Forest Oil established by a preponderance of the evidence that Luke Band, an officer and part-owner of Harley Crane, Wadleigh's crane division, agreed to convert the crane contract from a monthly flat fee arrangement to an hourly

arrangement.

Novation is the extinguishment of an existing obligation by the substitution of a new one. La. Civ. Code art. 1879. The most important factor in determining whether a novation has been effected is the intent of the parties. Scott v. Bank of Coushatta, 512 So. 2d 356, 360 (La. 1987) (citing Placid Oil Co. v. Taylor, 325 So. 2d 313, 316 (La. App. 3d Cir.1975); Midlo & Lehmann v. Katz, 195 So. 2d 383 (La. App. 4th Cir. 1967)). A novation may occur where the intent of the parties, the character of the transaction, the facts and circumstances surrounding the transaction, and the terms of the agreement reveal a desire to effect a novation. Id. (citing Cane River Shopping Ctr. v. Monsour, 443 So. 2d 602, 604 (La. App. 3d Cir. 1983)).

Kim Fawvor testified about his communications with Band regarding the hourly arrangement and the Court found Fawvor to be a credible witness. The documentary evidence, which includes correspondence from Band that corroborates Fawvor's version of events, is consistent with an agreement to convert to an hourly contract in lieu of an availability contract. At trial Band denied any involvement in the September 29, 2004, letter to Fawvor confirming the conversation between Band and Fawvor on an hourly pricing structure for crane maintenance. The Court does not find Band's testimony to be credible particularly in light of the October 1, 2004, email response from Band in which he responds to Fawvor's follow-up inquiry

about the September 29, 2004, letter.  (Exh. 43).  Moreover, the Court was unimpressed with Band's assertion that he lacked the authority to make such an agreement on behalf of the company.  If he did in fact lack that authority, then his communications with Fawvor, when considered in conjunction with his corporate title, support the conclusion that he had apparent authority to novate the crane contract.

In sum, Wadleigh is not entitled to recover from Forest the monthly flat fee for the crane maintenance contract for the months of October, November, and December in 2004.

**2.    *Breach of Contract--Electricians Contract (July 2004-December 2004)***

Wadleigh is not entitled to payments under the electricians contract for the July to December 2004 time period because the evidence clearly establishes that the parties mutually agreed to terminate that contract at the end of June 2004.

In June 2004 Forest Oil directed Wadleigh to remove all of its electricians from the Forest Oil platforms.  It is undisputed that Wadleigh provided no electrician's services after this time. Prior to this time the parties had been operating under a flat rate contract and Wadleigh had been invoicing Forest Oil without fail under that contract for at least two and a half years.  When Forest Oil directed Wadleigh to remove all of its electricians from the Forest Oil platforms, Wadleigh not only acquiesced in this action but

Wadleigh also immediately ceased invoicing Forest Oil.

Debra Derham, Wadleigh's corporate controller, testified that she simply stopped invoicing Forest Oil for the electricians contract based on her own assumption when the electricians stopped going out in July 2004.  The Court found this testimony to be incredible and inconsistent with Derham's responses to other questions when she asserted that she was not familiar with the terms of the Forest Oil contracts, and that she received direction for invoicing and prices directly from Ralph Wadleigh.  The Court finds it utterly implausible that the corporate accounting officer, who takes direction from the company's president regarding much smaller billing matters, would simply decide based on an assumption to cease billing the company's largest customer for such a lucrative contract.

Moreover, Ralph Wadleigh was equally unconvincing when questioned about why the billing for the electricians contract ceased in July 2004.  Wadleigh testified that the contract was in some sort of "hold status" while Forest Oil "tried some other people," and that this explains why Wadleigh suddenly invoiced Forest Oil in December 2004 for the entire last half of the year. Ralph Wadleigh's testimony in this regard was not credible or plausible.  The more likely explanation is that after agreeing to  terminate the electrician's contract, Wadleigh simply thought better of it.

In sum, the evidence supports Forest Oil's contention that the parties mutually agreed to terminate the electricians

14

contract in July 2004. Wadleigh is not entitled to payments under the electricians contract for the July to December 2004 time period.

### 3. *Services Rendered Claims*

Wadleigh is not entitled to additional payments from Forest Oil for services rendered for crane, electrical, and welding services. Although the Court is not persuaded that Wadleigh engaged in any type of fraudulent conduct in its billing practices, the evidence offered at trial did establish that Wadleigh's billing was "inaccurate" at times, and that the "inaccuracies" invariably inured to Wadleigh's benefit, including some increase in crane maintenance rates after the Unocal acquisition.

In sum, Wadleigh has been paid all it is entitled to receive from Forest Oil.

## B. Forest Oil's Counter Claim Against Wadleigh

Forest Oil's claims against Wadleigh are dismissed with prejudice.

### 1. *Recission of the Contracts*

Forest Oil is not entitled to recission of the crane, electricians, and welding contracts. The evidence did not establish that Forest Oil's consent to the contracts was vitiated by any fraudulent conduct on the part of Wadleigh or that any conflict of interest on the part of Meyers rose to such a level so as to allow Forest Oil to eschew its obligations under the contracts.

None of the evidence offered suggested any fraudulent or unethical conduct on the part of Wadleigh such that Forest Oil would be entitled to rescind any of the agreements.  The Court credits the testimony of Meyers and Knell who testified that Wadleigh had been responsive to Forest Oil's needs, and overall a good vendor, notwithstanding an occasional problem that the parties mutually resolved.

Forest Oil clothed Meyers with apparent authority vis à vis Wadleigh to execute all of the contracts at issue.  It is undisputed that Meyers had authority to offer the contracts for bid and given the value of the contracts it is inconceivable that Forest Oil's management did not know that Meyers had been contractually binding the company to vendor contracts for years.  Forest Oil willingly obtained the benefits of the service contracts that Meyers executed on behalf of the company and relied upon the services being provided to conduct its offshore operations.  Forest Oil is estopped from now arguing that Meyers had no authority to enter into the service contracts at issue.

Moreover, the Court is not persuaded that any conflict of interest on Meyers' part affected his decision to use Wadleigh as a vendor.  Meyers, who is in the business of buying and selling racehorses sold a single horse to Ralph Wadleigh for $35,000, and the Court credits Elougia Meyers' testimony that the horse was worth at least that much money.

The evidence pertaining to Elougia Meyers' sale of

16

uniforms to Ralph Wadleigh was equally unimpressive. There was no evidence that Ralph Wadleigh paid any more for the products he purchased from Ms. Meyer than what any other customer paid for the same products. The Court found both of the Meyers to be credible witnesses, and in particular the Court credits Meyers' testimony as to the legitimate reasons that Wadleigh had been selected for the maintenance contracts at issue. In fact, Wadleigh had been one of Forest Oil's vendors since the early 1990s.

Finally, Forest Oil cannot escape its obligations under the contracts by complaining in hind sight about the markup for parts and the rates that were charged. No evidence was offered to suggest that the contract rates were grossly out of line with industry standards, and prior to 2004 Wadleigh had been awarded the contracts pursuant to a competitive bidding process. When Forest Oil underwent a management changeover in 2004 it became apparent that the new management did not agree that Wadleigh's services were worth the rates being charged. However, the law does not allow recission of a valid contract based on hindsight that later suggests that the deal was uneconomic or imprudent <u>Med. Adjust. Bureau, Inc. v. Garrett, 420 So. 2d 223, 225 (La. App. 3d Cir. 1982) (citing McNeely v. Baron Constr. Co.</u>, 261 So. 2d 333 (La. App. 4th Cir. 1972)).

In sum, Forest Oil is not entitled to recission of the contracts at issue.

**2.    *Wadleigh's Violation of the Louisiana Unfair Trade***

***Practices Act***

Forest Oil is not entitled to recover under the Louisiana Unfair Trade Practices Act ("LUTPA") because the evidence does not establish that Wadleigh engaged in any fraudulent or deceptive conduct or any business practice that was unethical, oppressive, unscrupulous, or substantially injurious. <u>Turner v. Purina Mills, Inc.</u>, 989 F.2d 1419, 1422 (5th Cir. 1993) (citing <u>Bolanos v. Madary</u>, 609 So. 2d 972, 977 (La. App. 4th Cir. 1992)).  The LUTPA does not offer redress for mere acts of negligence.  <u>Id.</u> (citing <u>Marshall v. Citicorp</u>, 601 So. 2d 669, 670 (La. App. 5th Cir. 1992)).

Any overbilling that occurred during the course of the parties' agreements was done out of inadvertence or negligence. The evidence did not establish that any overbilling was done with an intent to defraud Forest Oil.  Nor did the evidence suggest any unethical or unfair conduct on the part of Wadleigh.

In sum, Forest Oil has not carried its burden of establishing that Wadleigh violated the LUTPA.

### 3.   ***Forest Oil's Claims for Breach of Contract***

The evidence does not establish that Wadleigh failed to perform under the crane, electricians, and welding contracts so as to entitle Forest Oil to damages for breach of contract. Although the evidence established that Wadleigh did on some occasions have less manpower in the field than what the contracts ostensibly required, Ralph Wadleigh explained that

Forest Oil was responsible for getting the Wadleigh personnel out to the platforms, and that Wadleigh's personnel at times had problems accessing the platforms due to problems with Forest Oil.

Further, the contracts at issue were properly characterized by Ralph Wadleigh as "availability" contracts which is significant because under such an arrangement the customer pays for services at a flat rate even where actual manhours are not spent on the platform.  None of the evidence suggests that Wadleigh's services were deficient or that Forest Oil endured downtime on its platforms or additional costs as a result of a manpower shortage.  Forest Oil's performance in the Gulf was considered excellent during the years that Wadleigh performed services for Forest Oil.  The evidence does not support the contention that Wadleigh breached the contracts.

Further, the evidence does not establish that Wadleigh breached the crane maintenance agreement in the post-Unocal time-frame by exceeding the pre-Unocal rates.  The sole evidence offered regarding the agreed upon terms of the 2004 extension came from Meyers and Knell.  The evidence establishes that Meyers and Knell were in agreement that the 2004 carryover on the crane contract would have to be at the same rates as the previous year.  However, no testimony was offered regarding the specific discussions that took place between Forest Oil (Meyers) and Wadleigh (Reine), and Meyers never testified as to the price that Wadleigh had agreed upon.  Moreover, the

19

evidence regarding the specific number of cranes owned by Forest Oil after the Unocal acquisition was in dispute.

If the parties had expressly agreed to maintain the 2003 crane rates for 2004, Meyers would have immediately caught the error when the crane maintenance costs increased post-Unocal. All of the evidence offered regarding the specific agreement governing services in 2004 was vague and equivocal.

In sum, Forest Oil has not established that Wadleigh breached any of the parties' contracts.

Each party shall bear its own costs.

March 26, 2007

_____
JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE